Opinion by
Head, J.,
In the spring of 1907, the defendant, contemplating the erection of eight houses, had detailed plans and specifications prepared showing, inter alia, the kind and quantity of lumber and mill work required for each house. These plans were submitted among others to the plaintiffs whose business was the manufacturé and supply of such materials. They were asked for a bid. On April 25th they submitted detailed lists of lumber and mill work which they had figured out from the plans. Each of the several sheets covered by the items of these fists contained the following warning, viz.: “Read your estimate carefully and see that nothing' is omitted, as we agree to furnish only the material enumerated below. We always figure on stock materials unless otherwise specified.” Separate prices for each item were not given but the entire fist was inclosed with and as a part of the following letter, viz.: “We will furnish the lumber, mill work and stair work as per our fists dated April 25 for eight houses to be erected in Lansdowne for the total sum of three thousand nine hundred and twenty-five ($3925) dollars. Trusting we will receive the order, we remain, &c.”
Upon the receipt of this bid, the defendant, without hastily accepting it, appears to have reached the conclusion that he would be justified in making some changes in the lumber and mill work which would add sensibly to the cost of each house. He therefore made out a fist of the proposed changes and again submitted the whole matter to the plaintiffs for another bid. On May 2d the plaintiffs wrote him making a detailed statement of the proposed changes without any detailed prices and made this bid, viz.: “We will furnish the entire lot for the total sum of four thousand five hundred and sixty-five dollars and sixty cents ($4565.60). Trusting we will receive the order, we remain, &c.” On the same day (May 2d) the defendant signed and delivered to the plaintiffs the following acceptance of the revised bid, viz.: “Your estimate dated May 2, 1907, amounting to $4565.60 for *237 mill work and stair work and lumber for buildings, &c. is hereby accepted. Terms &c.”
Deliveries under this contract began promptly and' progressed as the construction of the houses advanced, without any question on either side, until about the middle of August. At that time the larger portion of the materials enumerated in the plaintiffs’ bid had actually been delivered and incorporated into the buildings for which they were designed, but a very considerable amount yet remained undelivered. The plaintiffs then informed the defendant that a serious blunder had been made in the preparation of their bid in that they had named, as the total price, what was in fact only intended to be the price of the mill work; the price of the lumber which had been as they alleged, computed separately, and which amounted to between $3,000 and $4,000, having been inadvertently omitted. They desired the defendant to agree to some modification of the contract, the precise character of which is not disclosed by the testimony, which would relieve them from the consequences of their mistake and require him to pay a large amount in excess of the bid he had accepted. They attempted to explain to him that the discrepancy between the value of the materials agreed to be furnished and the amounts named in the several bids they had made was so great that the defendant’s experience as a builder must have warned him that a serious mistake had been made, etc. The defendant replied that he realized the price was low and that was the reason he had accepted the final bid, after having added considerably to the material designed for each house, but if a mistake had been made that was not his concern and he could now do nothing to remedy it. Without any notice to him of the attitude which the plaintiffs would then assume, they appear to have determined to go on and complete their contract and finally furnished the remaining portion of the material included in their bid. They then demanded of the defendant, without any reference to the contract at all, that he pay for all of the material furnished at the *238 market prices of the various items, and, upon his refusal so to do, filed a mechanic’s hen for the entire amount remaining due on that basis, after deducting the payments which the defendant had from time to time made according to the terms of the written contract. •
The defendant thereupon filed his petition under the provisions of the twenty-fifth section of the act of 1901, which was so proceeded in that the court below found that the amount admitted by the defendant to be still due on each of the eight houses was $226.79, and ordered that, upon the payment of that sum and the giving of security for the future payment of any additional sum that might be found to be due to the plaintiffs, the lien should be stricken off. The defendant then paid to the plaintiffs the sum of $226.79 with interest and costs, filed the bond, and the present issue was prepared to determine what further sum, if any, was due to the plaintiffs. The issue, as required by the statute, was to be tried as if a scire facias had been issued upon the lien.
On the trial the plaintiffs were permitted to offer evidence, over the objection of the defendant, of the market price, at the times of delivery, of all the items of the lumber and mill work which had been specified in their bids and furnished by them. They further showed that the defendant was a builder of experience and as a result thereof asked the jury to find he knew, or should have known that a serious mistake had been made in the bids. From these facts, if established to the satisfaction of the jury, the learned trial court instructed the latter they might draw the inference that there never had been a valid contract between the parties as to the price of the material furnished; and permitted them to find a verdict for something over $600 as the balance due on the single building to which alone this proceeding applied. Judgment was afterwards entered on the verdict for the amount named with interest and costs, and the defendant appeals.
From time Immemorial equity has sanctioned the *239 rescission or compelled the reformation of written contracts where it was clearly made to appear that both parties had entered into the contract on the mutual but mistaken assumption of the existence of some fact; or where, owing to the ignorance or lack of skill of the scrivener, or the fraud of one party, the written instrument did not fairly express what had in fact been mutually agreed on; or where the contract being still executory and having been suddenly entered into, its execution would result in such great injury to the one party that it would be unconscionable on the part of the other to insist upon such execution, etc. Most of the text-book principles and cases cited and relied on by the able counsel for the appellees deal with one or the other of the classes above named or situations ejusdem generis.
But during all of the period named there has existed another principle, manifested through an unbroken line of authorities, declaring that courts of equity will not reheve a party from the consequences of an alleged mistake which is purely the result of his own supine or inexcusable carelessness, where he has, within his own hands, every means to enable him to avoid such a mistake by the exercise of reasonable care; and especially is this so when his application for relief is postponed to a time when it is beyond his power to restore to the other party the situation he occupied before the contract was entered into. The principle is thus stated by Lord Campbell in Duke of Beaufort v. Neeld, 12 Cl. & F. 248: “No case can be found in which a court of equity has been successfully asked to interfere in favor of a man who willfully was ignorant of what he ought to know; or where a man who, without exercising that diligence which the law would expect of a reasonable and careful person, committed a mistake in consequence of which the proceeding in court has arisen and it has been repeatedly decided that equity will not relieve against mistake where the party complaining had within his reach the true state of facts.” A number of decisions of the courts of last resort in American juris *240 dictions, other than our own, will be found collated in a note to the case of Stone v. Moody, reported in 5 L. R. A. (N. S.) 799, from which we select the following:
“In Diman v. Providence W. & B. R. R. Co., 5 R. I.130, it was held that equity will not rescind and cancel an agreement by a party whose negligence or carelessness permitted his hand to write what his will did not direct, where the other party acted upon the agreement, and there was no fraud or surprise to put the applicant for relief off his guard. In Pearce v. Suggs, 85 Tenn. 724, it was held that a partner who signed a contract to sell his interest, worth $30,000 for $20,750, would not be relieved from his bargain in equity on the ground of mistake, no fraud appearing, and the mistake being the result of want of care and diligence on his part. In Wood v. Patterson, 4 Md. Ch. 335, it was held that equity will not interfere in behalf of a party whose carelessness led him to enter into a compromise to his disadvantage. In Cape Fear Lumber Co. v. Matheson, 69 S. C. 87, it was held that a party who directs his bookkeeper to draw a contract, which he executes under seal without reading, will not be relieved from performance where there is no evidence of fraud, undue influence, or violation of confidence reposed, on the part of the other party.” In Brown v. Levy, 69 S. W. Repr. 255, cited and relied on by the appellant, the court of appeals of Texas, in disposing of a case much resembling the one before us, used this language: “This shows a consummated agreement and constituted a binding contract unless the mistake made by the plaintiff, in procuring data for his bid, should be held sufficient to release him from the contract. That it should not be given that effect is, we think, quite clear. The petition fails to show that the defendant was in anywise responsible for the mistake referred to. When the plaintiff offered to build the house for a specified sum, it was of no consequence, in so far as the validity of the contract was concerned, that the plaintiff had made a miscalculation in forming his preliminary estimates.”
*241 But we are not without ample authority in our own state for the conclusion that the same principle has always been here recognized and given its full effect in the determination of causes. In Susquehanna Mut. Fire Insurance Co. v. Swank, 102 Pa. 17, Mr. Justice Paxson said: “An instrument may be reformed in cases of fraud, accident or mistake, but where the mistake was the result of the supine negligence of a party who sleeps upon his rights until other duties and responsibilities have grown up, the law will not help him.” In Rose v. Barclay, 191 Pa. 594, we quote the following from the opinion of Mr. Justice Dean: “Says this court, in Hazlett v. Powell, 30 Pa. 293, quoting with approval Atkinson on Marketable Titles: ‘When the means of information as to the facts and circumstances affecting the value of the subject of sale are equally accessible to both parties, and neither of them does anything to impose on the other, the disclosure of any superior knowledge which one party may have over the other is not requisite to the validity of the contract.’ And this is the common-law rule as stated by Story on Contracts, sec. 516. It is also laid down by Marshall, C. J., in the celebrated case of Laidlaw v. Organ, 215 U. S. 173. And it is said in Hershey v. Keembortz, 6 Pa. 128, referring to Laidlaw v. Organ, ‘a severer rule of morality would be impracticable in a commercial community.’ ” In Youngstown Electric Light Co. v. Poor District, 21 Pa. Superior Ct. 95, which in almost every respect, save one, resembles the case in hand, President Judge Rice reviews the question thoroughly and thus states the principle: “The general rule is that a mistake will not be relieved against if it is the result of the party’s own negligence, as for instance, where he has not taken the trouble to read, or to have read to him, the paper he was executing: Bispham’s Equity, sec. 191; Greenfield’s Estate, 14 Pa. 489; Penna. R. R. Co. v. Shay, 82 Pa. 198; Susquehanna Mut. Fire Insurance Co. v. Swank, 102 Pa. 17; Lewis v. Dunlap, 5 Pa. Superior Ct. 625. Especially is this the case where the application for relief has been postponed *242 until the contract has been fully performed by both parties, and the party seeking relief does not offer or is unable to restore the other party to his original position.”
Now although the evidence discloses that the defendant was a builder of experience, it cannot be contended that his knowledge derived therefrom was greater than, if indeed equal to that of the plaintiffs, whose special business it was to do the very things they undertook to do in the present case. They determined for themselves piece by piece just what material was called for by the plans and specifications submitted to them. In arriving at a conclusion as to the price at which they would furnish them, they were in no slightest degree influenced by anything done or omitted by the defendant. The very detailed character of the estimate they had made informed him that time had been taken to figure out from the general plans and specifications each particular kind of material required and the quantity thereof. He was advised their bid did not bind them to furnish all of the lumber and mill work called for in the plans and specifications as they might be construed by his architect or other tribunal. They stood upon their own construction as expressed in their detailed lists. The quality of what they agreed to deliver was to be measured by their declaration that their obligation would be discharged by the delivery of “stock materials.”
When they made their first bid on April 25, of $3,925, it was not hastily “snapped up” — to use the expression of some of the cases — by the defendant, knowing it to be an improvident offer, and without time for the bidder to reconsider. On the contrary, the defendant then submitted an additional fist of materials which were again gone over by the plaintiffs. These were not bid on specially and separately, but the plaintiffs must have recurred to their former bid and they then, on May 2, quoted a revised bid for the entire job, and it was this the defendant finally accepted. With this acceptance, what was before but an offer had become a contract, and the *243 plaintiffs again, in placing it upon their books and preparing to begin deliveries, had ample opportunity to observe what they now say should at once have been noticed by the defendant upon a mere inspection of the list of materials to be furnished and the price quoted therefor. They began the performance of the contract and continued to perform it until most of the material had been delivered and the houses fairly advanced toward completion before, as they allege, they themselves discovered the very serious mistake which had been made months previously. Upon their own discovery of the mistake and their allegation that the defendant knew it from the beginning, they argue they had the right to rescind the alleged contract because the minds of the parties had never met. Why then did they not do so? If there was then no contract obliging them to deliver the remainder of the materials, there was certainly none obliging the defendant to accept and pay for them at a price which he had never agreed to pay. Yet they have gone on, and without any notice to him as to what would be demanded of him, they delivered a large quantity of the material originally specified and now seek to charge him for the entire bill at a price which it is manifest he never intended to pay, to wit, the market price of the various articles at the time of their delivery. They thus present a written contract, executed by them with every appearance of deliberation, on the strength of which they delivered to the defendant large quantities of material which he intended to buy, not at the market price but at the competitive price established by the various bidders. After his situation had been so changed that he could not be restored to the position he occupied before his acceptance of the plaintiffs’ bid, they come into a court of equity. They say that, by their own inexcusable carelessness continued during a period which afforded ample time for its rectification, with every means of knowledge at their hands, in no way influenced or controlled by any act of the defendant, an injury has resulted to them. They *244 ask that this injury be repaired, not by the rescission of a contract not yet executed, not by the reformation of that contract to make it express what the parties in fact had agreed upon, but by simply striking it down because of its injurious consequences and by substituting for it an obligation of the defendant to pay at market price which, it is clear from the very fact that he sought competitive bids, he never intended to do. To permit the judgment in the present case, resting on such a foundation, to stand, would be in our view to go far beyond what any court has done or ought to do in the administration of equity between suitors. The result of the plaintiffs’ carelessness may be a financial loss to them, but such results are every day registered in the judgments of courts, the time of which is now largely consumed in ascertaining the liability of those who have been careless towards those who would suffer as a consequence of such carelessness, did not the law require such consequences to be borne by those whose act or neglect produced them.
We are of the opinion the learned judge should have affirmed the defendant’s fourth point for a binding direction in its favor and the thirteenth assignment of error is therefore sustained.
Judgment reversed.