D'OLIER ENGINEERING CO. v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit. April 9, 1917.    Rehearing Denied August 28, 1917.)

No. 2108.

COMPROMISE AND SETTLEMENT ⊗══19(1)—ANNULLING SETTLEMENT—MISTAKE.
    Where the contract for furnishing and installing boilers for the government made the price to be paid to depend in part on their efficiency, to be demonstrated by tests made by a government representative, an executed settlement cannot be avoided, and overpayment recovered on the ground of mistake in the test; he having acted in good faith, and the parties having accepted such action in good faith and made it the partial consideration for a settlement of other differences between them.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Action by the United States against the D'Olier Engineering Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

William B. King and George A. King, both of Washington, D. C. (P. F. Rothermel, Jr., of Philadelphia, Pa., of counsel), for plaintiff in error.

John H. Hall and Thomas Ross, Asst. U. S. Attys., and Francis Fisher Kane, U. S. Atty., all of Philadelphia, Pa.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below the United States brought an action at law against the D'Olier Engineering Com-

pany, to recover an alleged mistakenly made overpayment in settlement of a contract for furnishing and installing boilers for the Panama Canal. Trial by jury having been waived, the case was heard by a judge, who entered judgment for the government for the full amount of its claim. Thereupon the defendant took this writ of error. The opinion of the court below is reported in (D. C.) 215 Fed. 209. The proofs in the case tended to show that having been the accepted bidder on proposals submitted by the government, the D'Olier Engineering Company, hereafter called the contractor, on November 7, 1907, entered into a contract with the United States, represented by the Isthmian Canal Commission, to furnish and install two large boiler plants at Gatun and Miraflores. By such contract the contractor guaranteed:

"Each boiler to develop the nominally rated horse power of not more than five (5) per cent. above, at an efficiency of seventy-two (72) per cent., and a capacity for evaporation of 17,000 pounds of water per hour under the conditions of the test prescribed in paragraph 4 of the specifications, under item 1 of circular 444."

The test of this guaranty was an official one, provided for by article XI of the contract as follows:

"Article XI. As soon as practicable after erection of the respective plants on the Isthmus, and before acceptance, provided the boilers shall have successfully withstood the preliminary tests called for herein or in the specifications, there shall be conducted on at least one boiler of said plant an official test made by the engineer of the Commission in charge or his deputy designated for the purpose and an official representative of the contractor, the expense of said test to be borne by the Commission, and the same to be conducted under the conditions described in paragraph 4 of the specifications given under item 1 of circular No. 444."

The price of the boilers was fixed by article XII, which is as follows:

"The price of the boilers as given in article I is based upon an efficiency of sixty-five (65) per cent. developed by the test provided in article XI. Should the said test demonstrate that the efficiency falls short of sixty-five (65) per cent., there shall be deducted from the price of the entire plant to which the test applies one thousand dollars ($1,000) for each reduction of one below the said efficiency percentage and a proportionate amount for any fractional part of said reduction, fractions being carried to the second place of decimals. Should the said test demonstrate that the efficiency exceeds sixty-five (65) per cent., there shall be added to the price of the entire plant to which the test applies, one thousand dollars ($1,000) for each increase of one above the said efficiency percentage and a proportionate amount for any fractional part of said increase, fractions being carried to the second place of decimals. Should the efficiency developed by the said test fall below sixty (60) per cent., the contractor may be required to remove the boilers composing the plant and install, without extra cost to the Commission, boilers of the required efficiency. The boilers first installed will be used by the Commission until the substitutes have been installed, tested, and found to comply with this contract."

The scope of the test is shown by the fact that if the boilers fall below the required test, the contractor could be required to remove them and construct others of the required efficiency. The nature of the test was fixed by article XIV of the contract, which provides as follows:

"All questions relating to final inspection and acceptance of the plants or materials to be supplied hereunder, or the failure of the said plants or materials to comply with the specifications, or default in the time of delivery or

performance, or damages sustained by the Commission by reason of the failure of the contractor to comply with this agreement, shall be determined by the chairman of the Commission, or by any officer or deputy to whom the chairman may assign that duty; and such default or assessment of damages, when expressed in writing, shall be prima facie evidence of breach of contract and of the damages sustained by the Commission, and shall cast upon the contractor and his sureties the burden of showing that such finding or assessment of damages is unfair upon its face, or collusive, or was arrived at contrary to the provisions of this agreement."

It will thus be seen that the exclusive right to make the test and to determine the question of the fulfillment of the contract and its guaranties, was in the government, a situation akin to that of Kihlberg v. United States, 97 U. S. 398, 24 L. Ed. 1106, namely:

"The parties, however, concurred in designating a particular person, a chief quartermaster of the District of New Mexico, with power not simply to ascertain but to fix the distances 'which should govern in the settlement of the contractor's accounts for transportation."

The procedure provided by the contract was followed when the boilers were completed and ready for test. Such test was made on behalf of the government by one Schildhauer, representing the government, and in the presence of Lafore, the representative of the contractor. Both of these men joined in a report to George W. Goethals, the chairman and chief engineer of the Isthmian Commission, who, as provided by article XIV of the contract, either by himself or by any officer or deputy to which he might assign that duty, at the final inspection and acceptance of the plant, had the right to determine "all questions relating to final inspection and acceptance of the plants." Having received this report, Col. Goethals took up the question of closing the contract, and with the expressed purpose of "closing up the contract" and preparing a report in such shape that the "general purchasing officer of the Commission can prepare the necessary supplemental agreements, if any are necessary, or take action in the matter of making final settlement," addressed the following letter:

"Lt. Col. W. L. Sibert, Division Engineer, Gatun, Lt. Col. C. A. Devol, Chief Quartermaster, Culebra. Mr. W. W. Warwick, Examiner of Accounts, Empire. Gentlemen: Closing up the contract with the D'Olier Engineering Company for boilers, etc., at Gatun and Miraflores requires consideration and recommendation on changes in the contract, interpretation of contract specifications, and various points of fact in connection with the time of delivery, completion and delivery of the plant.

"I have received a joint report from Mr. Schildhauer and Mr. Lafore, the latter being the representative of the contractor, and before forwarding the papers to the general purchasing officer in the United States it is desired that all matters at issue between the contractor and the Commission be considered and passed upon by a committee, which is, therefore, appointed with Mr. Warwick as chairman. Col. Sibert and Col. Devol will please appoint representatives to act on this committee with Mr. Warwick, who will appoint times and places of meetings. It is expected that Mr. Schildhauer will be called upon to give any further information desired in connection with this contract and the committee should also allow any representative of the contractor on the Isthmus to appear before it.

"It is desired that the committee's report be in such shape that the general purchasing officer of the Commission can prepare the necessary supplemental agreements, if any are necessary, or take action in the matter of making final settlement.

"Respectfully,        Geo. W. Goethals, Chairman and Chief Engineer."

This committee, having "carefully considered the questions which have arisen in connection with the settlement under the contracts," reported four different items of credit and one of debit against the contractor, and further a charge against the contractor of a deduction of $1,500 for superheating. This report of the committee provided for the allowance fixed by the test made by Schildhauer, who, as stated by Col. Goethals, was to be called before the committee. This bonus allowance to the amount of $5,460 constitutes the alleged overpayment in this case. The report, which was in writing, stated:

"The committee finds that the plant at Gatun (similar report as to Miraflores) has been completed and has been in satisfactory operation for more than sixty days, that the required tests have been made, and that this plant is ready for final acceptance on the conditions hereinafter stated. After consideration of the claims of the contractor with reference to the Gatun plant, the committee recommends that the following items be allowed the D'Olier Engineering Company by the chairman and chief engineer, * * * for bonus under article XII of the contract of November 17, 1908; the boilers having shown an efficiency of 79.72 per cent., being an excess of efficiency of 14.72 per cent. over the required sixty-five (65) per cent., at a thousand dollars for each per cent., or fraction thereof, of excess efficiency $14,720."

On January 31st Col. Goethals transmitted this report to Capt. Boggs, general purchasing officer of the Isthmian Commission at Washington, stating:

"The findings of this Commission have my approval. You will please enter into supplemental contracts and make payment in accordance therewith."

In pursuance of this direction, the Isthmian Commission and the contractor, with the assent of its surety, entered into a supplemental agreement, dated the 28th of February, 1910, wherein, after reciting, inter alia, that:

"Whereas the boilers of the Gatun plant did develop an efficiency of 79.72 per cent., being an excess of efficiency of 14.72 per cent. over the 65 per cent. required under article XII of the contract of November 17, 1908; and whereas, the Gatun plant did develop the superheat required by the specifications," the contract provided:

"Now, therefore, in consideration of the above and of the acceptance by the Commission of the plant notwithstanding the ascertained deficiency in superheat, and the agreement by the contractor to a deduction of $1,500.00 from the contract price on account of such deficiency, it is hereby understood and agreed that final settlement for the Gatun plant shall be made as follows:

| | | |
|---|---:|---:|
| Original contract price for Gatun plant under contract of November 17, 1908 | $60,335 00 | |
| Additional under contract of February 10, 1909 | 4,708 00 | |
| For six extra oil burners furnished | 403 65 | |
| For additional enameled brick furnished | 21 92 | |
| For furnishing vitribestos pipe covering and flue lining | 2,340 00 | |
| For bonus on the excess of 14.72 per cent. over the boiler efficiency of 65 per cent. required of the boilers of the Gatun plant at the rate of $1,000.00 for each per cent. of excess thereof | 14,720 00 | |
| | | $82,528 57 |
| Less amount which the contractor hereby agrees shall be deducted on account of deficiency in the superheat of Gatun plant | 1,500 00 | |
| Less amount previously paid | 63,043 00 | 66,543 00 |
| Balance | | $15,985 57" |

From the above facts, it will be seen: First, that the question of efficiency of the boilers was passed upon and determined by the United States in pursuance of exclusive authority so to do both by the engineer Schildhauer and by Col. Goethals acting by a designated committee; second, that this test was accepted and acted upon by the engineering company in making a supplemental contract, which conceded and surrendered a superheating claim it had against the government; third, that the settlement was made in good faith by all parties, who were ignorant of any mistake having been made in the boiler test.

Some months after the settlement was made and the money paid, it was discovered a mistake had been made in the intricate calculations involved in determining the efficiency of the boilers, and that the bonus of $14,720 should have been but $9,260. For this alleged difference of $5,460 in the Gatun plant and $6,883 in the Miraflores plant, in all for $12,343, this suit was brought.

It will thus be noted that this action at law while in form for the recovery of money mistakenly paid under the contract of November 17, 1908, is in reality the annulling of the settlement of February 28, 1910, so made by the parties, of all matters in dispute under said contract. This suit is not to enforce any contract, express or implied, but it seeks to invalidate a settlement contract that has already been performed, and that without either the willingness expressed or the power possessed to restore the parties to their previous status. By this suit the government forecloses and excludes all those equitable considerations and plastic powers which a chancellor could exercise were this a bill to rescind the agreement of settlement. In effect, this suit seeks to strike from such settlement the item of bonus which was favorable to the contractor, while it still leaves in force by the settlement the item of superheating charge made against the contractor. In other words, the plaintiff seeks an alleged equity of its own, while it omits to do equity to the contractor. Moreover, it is quite evident that the lapse of time, the destruction of data, and the scattering of witnesses and disappearance of proof, which would naturally ensue when a contract was performed such a distance abroad and so many years ago, might well deter a chancellor from now undertaking, even in a bill in equity, to work out the equities and rights originally involved in the contract. That a mistake was made may be conceded, but in the making of that mistake the contractor had neither part nor knowledge, for the test was by the contract made the sole and final act of the government. No question of bad faith is involved. It is quite evident that in closing up this contract, as stated by Col. Goethals, there was required consideration, interpretation, changes, and ascertainment of facts, and that it was "desired that all matters at issue between the contractor and the Commission be considered and passed upon by a committee, which is therefore appointed." This duty the committee fulfilled, with the result that a contract of settlement was thereafter made and performed. That the mistake made was not made by the committee itself, but by the report of those who made the test, in no way changes the principle of the finality of settlements here involved, for if the court has power to unsettle the committee's settle-

ment because of the mistake made by those who made the boiler test, undoubtedly the committee had power to decline to accept the boiler test as a finality and make the result of the test an element in its report, and indeed their attention was expressly called to that feature of their work, viz.:

"It is expected that Mr. Schildhauer will be called upon to give any further information desired in connection with this contract."

The parties having accepted the committee's action as a finality and settled on that basis, the law is averse to unsettling settlements, for to warrant rescission there must be a restoration of the status in quo (1 Black on Rescission, § 127, p. 360; Felin v. Futcher, 51 Pa. Super. Ct. 241; Bispham's Equity, 196), and a party cannot recover back a proportionate amount of a price (Rand v. Webber, 64 Me. 191). While cases and text-books have been cited showing that equity will rescind an unexecuted agreement in case of mistake, yet no case is shown to us where, after a settlement has been made and fulfilled, a party to that settlement can stand on the settlement, so far as it was in his favor, and disaffirm it in items that were against his interests. But apart from all these questions, we think the case is governed by Kihlberg v. United States, supra, for here, as there, the fixation of the item in question was, by the contract, left to the determination of a certain person, and he having acted in good faith and the parties having accepted such action in good faith and made it the partial consideration for a settlement of other differences between them, this court is justified in refusing to allow such settlement to be unsettled on the ground that a mistake was made by the person empowered by the contract to make the test.

The judgment entered below will therefore be vacated, and the cause remanded for further proceedings.