OHIO SAV. BANK & TRUST CO. v. WILLYS CORPORATION (UNITED STATES, Claimant).

(Circuit Court of Appeals, Third Circuit. December 1, 1926.)

No. 3423.

United States ⟨⟩75—Settlement between government and war contractor by supplemental contract held final, and such as could not be disregarded.

Settlement between government and war contractor made by supplemental contract *held* final, and such as could not be disregarded by government asserting claim in receivership proceedings against successor in interest of contractor.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Receivership proceeding by the Ohio Savings Bank & Trust Company against the Willys Corporation, wherein the United States filed a claim. From a decree disallowing said claim, the United States appeals. Affirmed.

See, also, 287 F. 939.

Walter G. Winne, U. S. Atty., of Hackensack, N. J., John G. Sargent, Atty. Gen., Alexander Holtzoff, of New York City, Paul Shipman Andrews, of Syracuse, N. Y., Jerome Michael, of New York City, Charles R. Pollard, of Washington, D. C., and Benjamin J. Manley, of Detroit, Mich., for the United States.

John M. Enright, of Jersey City, N. J., and Joseph P. Cotton, of New York City, opposed.

Before BUFFINGTON and DAVIS, Circuit Judges, and THOMSON, District Judge.

THOMSON, District Judge. About November, 1917, Duesenberg Motors Corporation was manufacturing engines of various types in a recently constructed plant at Elizabeth, N. J., and had a well-established business. On November 20, 1917, the Duesenberg Corporation entered into a contract with the United States to furnish the necessary organization plant and facilities, including increased facilities necessary to produce 500 Liberty motors, for which the government agreed to pay cost as defined in the contract, plus a fixed profit. The contract contained a provision allowing the government to terminate the same before performance if the public interests so required, upon a certain notice, in which case the contractor would be entitled to reimbursement for all expenditures incurred, plus the agreed fixed profit on articles completed, plus the cost of material on hand, and the cost of manufacture of unfinished articles.

This contract was later modified by eight supplements, calling for changes in quantities and price, with a complete change in type of engines, and also requiring the acquisition by the company of greater plant facilities, so that the original contract, calling for the production of 500 Liberty motors, became a contract for the production of 2,000 motors of a certain French type. The original building was practically doubled in size and changed in construction. A factory plant at Poughkeepsie, N. Y., was acquired and moved to Elizabeth. The supplemental contract for the new type of engine seems to have been accepted by the contractor with the understanding that all experimental work had been done under the supervision of the government, and was ready for quantity production. Later, however, the government engineers determined that the design was defective, and proceeded to redesign it, and in doing so the engineering staff made nearly 1,000 alterations in the design before they were ready to start production. In the meantime the contractor had

been instructed to acquire large quantities of materials and to manufacture various parts, so that when the experimental work was ended it would be in a position to proceed rapidly with production. These changes in design were not completed until September, 1918. When the work of production got under way, and four motors only were completed and accepted prior to the Armistice, the contractor was fully prepared for maximum production.

Immediately following the Armistice, the contractor was notified by the government to suspend all operations, and then negotiations were undertaken by the officials of the War Department with the contractor, for the winding up of the contract by a further supplemental agreement, rather than by a formal termination under the clause for that purpose. During these negotiations various items of payment to be made to the contractor were adjusted, and the amounts were either paid to the contractor or credited by the government upon loans received by the contractor from the government.

It was necessary, however, that the supplemental contract, winding up the production contract, should be approved by the Claims Board of the Air Service. This board referred the settlement to the War Department Claims Board, which reviewed the entire settlement and reopened the negotiations. Upon the renewal of the negotiations, the settlement was modified by the abatement by the Duesenberg Company of the lump sum of $350,000 with certain other changes, and with these modifications the settlement was approved by the War Department Claims Board, and the contracting officer of the Air Service was authorized to carry out the settlement by entering into a supplemental agreement, winding up the production contract and settling all claims thereunder, with the exception of certain items specially reserved, and not involved in this appeal. This final supplement, dated August 14, 1919, has been fully performed according to its terms. The contractor then had an unwieldy plant, with no market for its product; its commercial business had been destroyed, and the plant in its altered form was not suited for general commercial business. The working capital of the company was exhausted, and it was heavily in debt, and facing bankruptcy.

In this situation, a combination was effected with two other corporations under the name of Willys Corporation, for the purpose of engaging in the manufacture of automobiles and accessories. It was planned to erect and equip an immense plant at Elizabeth, of which the existing plant would be a nucleus.

The new corporation issued first preferred stock to the amount of $15,000,000 which was sold to the public at par. The stockholders of the Duesenberg Company received, in exchange for their stock, second preferred stock of the Willys Corporation at par. When the first preferred stock was being sold, there was a nominal quotation for the second preferred stock on the New York curb market, but there is no evidence of any bona fide sales of this stock. The Willys Corporation erected an enormous factory, acquired additional lands, vacated streets, and expended about $10,000,000. Receivers were appointed for this corporation in November, 1912, and all assets have been liquidated, which has demonstrated that the second preferred stock has no value. The Duesenberg stockholders did not receive any dividends or distribution, after entering into the government contract, losing their entire investment as a result.

In August, 1922, long after the rights of the first preferred stockholders had been acquired, the government first asserted that it had a claim against the Willys Corporation, amounting to $1,060,207. The claim was disallowed by the receivers. On appeal to the District Court (287 F. 939), the government abated the claim to $638,748. The court referred the issues to a special master to hear and determine, and state an account. During the reference the government again changed its position, by amending its claim to $1,548,224. The master considered that the scope of his authority was the statement of an account between the government and the contractor, independent of any consideration of the settlement agreement, and therefore, on this legal question, he did not pass. Eliminating this question, the master stated an account resulting in a net balance due the government of $92,166.

The chief difference between the master's findings and those of the government agencies is in the amount of depreciation allowable upon increased facilities and test house. This is largely a matter of judgment. If the depreciation on these items as originally adopted by the appraisal board appointed under the contracts, were accepted, the restatement of the account by the master, would show a balance against the government. The District Court confirmed the findings of the master, except in so far as

said report finds the sum of $92,166 due the United States, and in lieu thereof decides that the settlement negotiated between the contractor and the government for the termination of the contract was just and fair, and decrees that neither the Duesenberg Corporation nor the Willys Corporation is indebted in any sum on the claim in controversy.

The decree appealed from is thus founded upon certain findings of fact and conclusions of law, based on the master's report. The findings of fact cover a very wide range, and their correct determination was the special province of the master and the court below on review of the master's report on, exceptions filed.

It is our opinion that the conclusion of the District Court, that the negotiated settlement was just and fair, and free from fraud or other infirmity, is fully sustained by the evidence in the case, and by the findings of the master in his elaborate report, and that such settlement is binding upon the government. This conclusion is based, among other things, on the following considerations:

First. The master expressly finds, and the court concurs in the finding, that no formal written notice of cancellation was given at any time by the United States to the contractor, and that at no time did any of the officers of the United States intend to terminate the contract by notice. It clearly appears from the master's report and the evidence, that instead of canceling the contract, the parties proceeded to negotiate a separate agreement terminating the contract.

Second. This procedure was in harmony with the general policy of the government, after the Armistice, of negotiating supplemental contracts of settlement through the several contract departments, rather than formally terminating the settlement, thus throwing the adjustment into the Treasury Department, or the Court of Claims.

Third. The evidence conclusively supports the master's finding that "it was considered that the Secretary of War had the power to amend and terminate the existing contracts by supplemental agreements, including the power to cover in such settlemental contracts a complete adjustment of all claims, and that it was in the public interest to have the contracts settled in this manner through the department having the necessary equipment and familiarity with their subject matters. As a matter of public policy, and in order to preserve the power to amend and make a settlement of the existing contracts, and to curtail production to the point of existing military needs, the Secretary of War invited all contractors to suspend work and to negotiate settlements, and set up in the War Department various boards for the adjustment of contracts and settlement of claims. Among the boards so established, was the Air Service Claims Board for the Bureau of Aircraft Production, and the Duesenberg Motors Corporation was one of the contractors invited to negotiate a settlement by supplemental contract."

Fourth. By authority of the Secretary of War, on November 9, 1918, Gen. Goethals, director of purchase, storage, and traffic, issued a general order supply circular No. 111, providing for the settlement of contracts. Paragraph 2 of that order provides that, "whenever a contract or order expressly provides that it may be terminated in the public interest, termination may be effected only in accordance with such provisions, *unless it shall be in the public interest to terminate it in accordance with the provisions of this circular and the parties shall agree thereto.*"

Paragraph 4 provides that, "if a notice of cancellation is given, the contracting officer of the government loses his power to enter into a supplemental agreement with the contractor."

Paragraph 6 provides: "If agreement is reached on a just and reasonable compensation to be paid to the contractor by reason of the suspension and termination of the contract or order, such agreement shall be embodied in a supplemental contract, etc."

Fifth. The binding character of such procedure is further shown in the manual of instructions issued by Gen. Burr, Assistant Chief of Staff, by authority of the Secretary of War, entitled, "Notes on Jurisdiction of the Secretary of War to Settle Contracts, etc., and the Usual Basis Used in Doing So." In this manual, at page 929, it is provided: "The power of the Secretary of War and heads of other departments to make contracts required for the exercise and performance of their duties arises by necessary implication and is confirmed by statute, and it is held that this power to contract necessarily carries with it the power to amend by supplemental contract and to terminate by agreement in like manner." At page 937 it is said: "Where a contractor has been asked to suspend, and has complied and cut down his costs and changed his position at the request of the United States, it is held that the government cannot take advantage of the changed situation." Other provisions to the same general effect are found in the manual.

Sixth. As the original contract contained

a cancellation clause defining the basis of settlement in the event of a formal cancellation, the parties seem to have used that formula as a basis for their negotiation. The government's case appears to rest on the erroneous theory that the contract was terminated under the provisions of the cancellation clause, and that therefore the payments made must accurately correspond with the cancellation clause of the agreement. In fact, the government, upon consideration of the public policy, refrained from putting the cancellation clause into operation.

Seventh. The government, through the Bureau of Aircraft Production, proceeded with great elaboration to reach a final settlement. When items of uncertainty were involved, a record of these was transmitted to the Claims Board of the Air Service. If that board in turn was uncertain, the matter was referred by it to the War Department Claims Board. This last-named board, concluding that the large amount of depreciation allowed required further examination, delegated a committee to make a further examination of the whole settlement. After a further reexamination of the whole settlement by the War Department Claims Board, a conference was had, in which was a special representative of the Secretary of War, a number of the War Department Claims Board, Assistant Directors of the Aircraft Production, and representatives of the contractor. The net result was a final decision by the War Claims Board that the original settlement should be reduced by the lump sum of $350,000, and, with that reduction, should stand approved. This final settlement, · perhaps because of financial stress on the part of the contractor, was agreed to. A formal agreement was drawn up, closing the settlement on this basis, and, after approval by the War Department Claims Board and the Claims Board of the Bureau of Aircraft Production, was executed by the government contracting officer. The progress of these negotiations is detailed by the master, who finds that the agreement was executed by "the authorized officer of the United States."

Eighth. The settlement agreed upon, the contractor fully performed his obligations under the settlement agreement, which involved the payment of a substantial sum of money, and has since irrevocably changed his status by the consolidation of its plant with another enterprise, and dismantling it so far as Bugatti engine production is concerned.

Ninth. The law, as we understand it, fully authorizes the settlement so made, and denies to the government the right to repudiate it. It has been held that "a contract between a corporation and the United States is to be construed, and the rights of the parties are to be determined, by the application of the same principles as if the contract was between individuals." Cooke v. United States, 91 U. S. 389, 23 L. Ed. 237; Hollerbach v. United States, 233 U. S. 165, 34 S. Ct. 553, 58 L. Ed. 898; United States v. Newport News Shipbuilding & Drydock Co. (C. C. A.) 178 F. 194; United States v. A. Bentley & Sons (D. C.) 293 F. 229. It has been established in the case of United States v. Corliss Steam Engine Co., 91 U. S. 321, 23 L. Ed. 397, that a settlement contract, in the absence of fraud or gross mistake, is binding upon the United States. The Supreme Court in that case, among other things, said: "There is no allegation or suggestion that the claimant was guilty of any fraud, concealment, or misrepresentation, on the subject; but, on the contrary, it is clear that every fact was known to both parties, and that the whole transaction, as stated by the court below, was unaffected by any taint or infirmity. If such a settlement, as the Chief Justice of the Court of Claims very justly observes, accompanied by the giving up by one, and the taking possession by the other, of the property involved, cannot be judicially maintained, it would seem that no settlement by any contractor with the government could be considered a finality against the government." This case is peculiarly applicable and practically conclusive of the case before us. The reasoning of the Corliss Case was adopted by this court in D'Olier Engineering Company v. United States, 244 F. 90–95.

Without stopping to discuss the decisions relied upon by the government in support of its contention that the settlement may be disregarded, it is sufficient to say that they are not applicable to the facts of this case and are plainly distinguishable. The decree of the court below is therefore affirmed.