## UNITED STATES v. KRAUS et al.
### No. 4754.

Circuit Court of Appeals, Seventh Circuit.
Nov. 25, 1932.

George R. Jeffrey, U. S. Atty., and Telford B. Orbison, Asst. U. S. Atty., both of

Indianapolis, Ind., and Frank K. Foster, Elton L. Marshall and J. S. Bohannan, all of Washington, D. C., for appellant.

Samuel D. Miller and Sidney S. Miller, both of Indianapolis, Ind., for appellees.

Before EVANS and SPARKS, Circuit Judges, and WILKERSON, District Judge.

EVANS, Circuit Judge.

Although it is vigorously attacked, we accept the decision of this court announced in 33 F. (2d) 406, unqualifiedly.

It is unnecessary, because of our disposition of appellees' other point, to consider the various authorities cited by appellees [U. S. v. San Jacinto Tin Co., 125 U. S. 273, 275, 8 S. Ct. 850, 31 L. Ed. 747; Heckman v. U. S., 224 U. S. 413, 439, 32 S. Ct. 424, 56 L. Ed. 820; U. S. v. New Orleans, etc., Co., 248 U. S. 507, 518, 39 S. Ct. 175, 63 L. Ed. 388; U. S. v. Gordin (D. C. S. D. Ohio) decided December 4, 1924, not reported [1]; U. S. v. McFarland (C. C. A.) 15 F. (2d) 823] in support of their position that the United States is not the proper party to maintain this action.

Assuming as we do that appellees lawfully bound themselves by contract with the Government to pay their excess profits to the War Industries Board for the benefit of the 1918 wool producers of the United States, in accordance with the regulations of said Board, the question still arises—Does not the evidence disclose the existence and presentation of a disputed claim which was settled and paid in full by appellees and a release given by appellant who in so doing lawfully acted for its principals, the aforesaid 1918 wool growers of the United States?

The facts: Appellee Kraus testified that in 1918 he was in the wool business, which was conducted in Indiana, Ohio, Michigan, and Illinois. Prices were determined somewhat by the grade of the wool. All wool bought in 1918 was taken to Fort Wayne, Indiana, to appellees' place of business and there sold to the Government. It was first graded by the Government, and a representative of the Valuation Committee examined the same, estimating the shrinkage, etc., and the price and poundage were fixed. Deliveries to the Government were made at various times. Appellees borrowed money at the local banks with which to buy the wool, and they were repaid by appellant at a later date. They dealt with approximately two hundred dealers or growers and handled 1,250,000

pounds of wool. Appellees' books were audited four times; three being by appellant's auditors. No two audits agreed as to the amount due from appellees. The parties did not then, and do not now, agree upon what items should be added to appellees' cost price before determining their excess profits. These disputed items include insurance, traveling expenses, commissions, telephone, and overhead expenses. The parties seemingly reached a basis for settlement in 1920, and appellees paid $17,026.73 for what they contend was a full settlement of all claims save one not here involved. Appellant thereafter reopened the matter, reasserted its right to reject items of cost set up by appellees, and demanded the additional sums sought to be recovered in this action.

The issues are therefore narrowed to three: (a) Was there a full settlement of the account? (b) Was the same binding on the United States Government? (c) Was Sherman, who represented the War Industries Board, authorized to act for the Board?

(a) Was there a final settlement and payment in full by appellees pursuant thereto?

Two audits were made by appellant before the parties reached their settlement, which appellees contend was a full and final one, and which was evidenced by a letter bearing date August 5, 1920, written by appellant and approved by appellees, portions of which letter are herewith quoted.

"It is maintained by Mr. Buist, and is your claim, that these items were not listed on your report as purchases of wool in *1918* because of being *1917 clip*, and, having been sold to the Government, this amount of wool should be subtracted from the sales on a pro rata basis.

"Mr. Buist advises us that you are ready to make immediate remittance of the *balance of excess profits* due the Government as shown by our audit, *if these items are omitted from the sales;* that you agree that such deduction shall be subject to verification by the Government and if it is later determined that this wool was not included in the sales an additional remittance will be made to cover the balance due.

"Subject to later verification, we are deducting 4,899½ pounds of wool (4,971 pounds less an average shrink of 1½ per cent) from the sales side of your report at an average of .725927 cents per pound.

"This amounts to $3,556.68 and Mr. Buist, on your behalf, agrees that immediate remit-

---

[1] Oral opinion not for publication.

tance will be made for the amount of $17,026.73."

Upon receipt of appellees' check which was mailed pursuant to this settlement, appellant, on August 20, 1920, wrote appellees as follows:

"We wish to acknowledge receipt of your check for $17,026.73 representing your excess profits made on 1918 wool transactions as shown by our audit of your report, which is subject, however, to change should we be unable to verify the poundage allowed as 1917 wool as per agreement made with Mr. Buist acting in your behalf."

On September 10, 1920, appellant sent appellees a receipt worded as follows:

"Received from Kraus & Apfelbaum under date of August 14, 1920, a remittance of $17,026.73, representing excess profits on their 1918 wool transactions.

"This is not a receipt in full, as it is possible that an additional amount may be collected if our further investigation shows that such is due."

In determining the finality of the settlement, it should be borne in mind that the first audit showed the excess profits to be $30,089.26; on the second audit the excess profits were fixed at $20,547.84. Included in this last-named balance was a profit on 4,899½ pounds of wool which appellees claimed they purchased in 1917. After this item had been deducted (because not involved in the 1918 clip), the balance was $17,026.73, which was paid. As there is no claim of fraud, misrepresentation or deceit entering into the settlement, it is impossible to escape the conclusion that a final settlement was effected, unless the last paragraph of the receipt which was executed by appellant, reserved to it the right to reopen the same. We have no hesitancy in finding that the reservation in the receipt related solely to the item of 4,899½ pounds of wool and the date when it was purchased, concerning which the letters above quoted made full explanation.

■■ (b) Was the settlement binding upon the United States Government?

In considering this phase of the case, it is, we think, clear that appellant was not acting in its sovereign capacity when it negotiated the settlement. It was merely the agent of the wool growers. It entered into a contract with appellees for the benefit of third parties, to-wit, the 1918 wool growers. By the terms of said contract, appellees agreed that profits over and above a certain percentage should be paid appellant to be distributed among said wool growers. Appellant's War Industries Board was to be the instrumentality which should provide rules and regulations for determining appellees' profits as well as its excess profits. Appellees dealt with said War Industries Board in good faith. They opened their books to the inspection of the Board's auditors. They accepted the auditors' computations and settled accordingly. They paid the amount claimed. Appellees could not later have assailed the settlement. Nor do the courts permit the Government to repudiate its settlement fairly negotiated. U. S. v. Corliss Steam Engine Co., 91 U. S. 321, 23 L. Ed. 397; Ohio Savings Bank & Trust Co. v. Willys Corp. (C. C. A.) 16 F.(2d) 859; Dayton Airplane Co. v. U. S. (C. C. A.) 21 F. (2d) 673.

■ (c) Was Sherman authorized to negotiate the settlement?

While the fact situation was such that it might well be questioned whether the burden was not upon appellant to show Sherman was not authorized to act for it rather than upon appellees to show such authority, we think the record affirmatively established his authority to make the settlement. The Government offered in evidence a letter signed by Sherman, "Specialist, in Charge Domestic Wool Section" as part of its proof. The substance of the letter showed that the writer exercised the authority of one in charge. One of appellant's witnesses stated that Sherman was in charge of the wool section. Numerous exhibits were received in evidence which showed Sherman to be acting for the War Industries Board, not only in determining the amount of the excess profits, but in receiving all money paid appellant therefor. Moreover, he was the individual who gave the receipts for the wool dealers' excess profits. Appellant, having accepted the benefit of his acts and retained the money paid pursuant to his determination of the amount of appellees' excess profits, may not repudiate its agent's authority to so act for it.

The judgment is affirmed.