## Hazlett *et al. versus* Powell *et al.*

Where a lessor demised a building in which were sundry windows opening on the ground of an adjoining owner, the erection of a party-wall by such adjoining owner, by which the windows were closed up, is not an eviction by the lessor, nor any defence to the payment of the accruing rent.

If the lessor, at the time of the demise, knew of the intention of the adjoining owner to build such party-wall, he was not bound to communicate such knowledge to the lessees.

Had the vacant lot belonged to the lessor at the time of leasing, then an easement, by implication, in the passage of light and air, would have followed. But such an implication exists only in case of ownership.

On a demise of lands, there is no implied warranty that the premises are fit for the purposes for which they are rented; nor that they shall continue so, if there be no default on the part of the landlord.

ERROR to the District Court of *Philadelphia.*

This was an action of replevin by Robert F. Hazlett and Robert M. Slaymaker against John Hare Powell and William Garrigues. The defendant Powell, and Garrigues, as his bailiff, avowed the taking of the goods as a distress for rent in arrear, to which the plaintiffs pleaded an eviction.

On the 12th May 1853, John Hare Powell demised and leased to the plaintiffs below a messuage and building, called the Columbia House, and ground thereto belonging, situate on the north side of Chestnut street, between Delaware Sixth and Seventh streets, and extending in depth to Carpenter street, in the city of Philadelphia, with the appurtenances, for the term of five years from the 16th May 1853; reserving the yearly rent of $6000 in equal monthly payments; with the rights of distress and of re-entry for non-payment of the rent reserved.

The hotel and premises demised had eighteen windows in the eastern side wall, overlooking a vacant strip of ground, which was the exclusive property of the adjoining owner. In August 1853, this strip was built upon, and a party-wall was erected thereon entirely closing up the windows on the eastern side of the demised premises; which was the eviction complained of.

On the trial, the defendants read in evidence the lease under which plaintiffs occupied the premises, and closed.

The counsel for the plaintiffs then proposed to read the deposition of C. J. Hoffman, taken by consent, and to follow it up by other evidence, to prove that when defendants leased the premises, there were on the east side thereof eighteen windows in as many rooms, opening on an alley or avenue four and a half feet wide; which windows were necessary for lighting and ventilating the said rooms, and were an appurtenance to the premises leased, and without which those apartments could not be used for the purpose of a hotel, as stipulated in the lease—that after the execution of

the lease, and before the rent accrued for which suit was brought, plaintiffs were entirely deprived of the use of said rooms by a party who held by title paramount to the lessor, and who, under his title, built a party-wall close against and covering said windows.  And also that the said lessor had been notified, previously to his making this lease, of the said title paramount—had admitted the validity of the same—knew of the intention of the party holding said title paramount to close said windows, and did not communicate said knowledge to the plaintiffs.

Defendants' counsel objected, on the ground that the construction of the party-wall, under the authority of the laws relative to such walls, by the owner of said property, adjoining the demised premises, was not in law such an eviction, or disturbance of the lessee's rights under the lease, as entitled them to any abatement or reduction of the rent.

The court below (SHARSWOOD, P. J.) overruled this offer, to which the plaintiffs' counsel excepted.  The learned judge then instructed the jury to find a verdict for the defendants; and a verdict and judgment having been rendered accordingly, the plaintiffs removed the cause to this court, and here assigned for error, the refusal of the court below to admit the evidence contained in their offer on the trial.

*Guillou* and *F. C. Brewster*, for the plaintiffs in error.—The construction of the party-wall, under the circumstances offered to be proved, was an eviction of the lessees, and suspended the rent: Naglee *v.* Ingersoll, 7 *Barr* 185; Hemphill *v.* Eckfeldt, 5 *Wh.* 274; Cohen *v.* Dupont, 1 *Sandf. S. C.* 260; Peters *v.* Grubb, 9 *Harris* 455; *Comyn on Land. and Tenant* 172, 180; Smith *v.* Merrable, 11 *M. & W.* 5; Edwards *v.* Etherington, *Ryl. & M.* 268; s. c. 7 *D. & R.* 117; Collins *v.* Barron, 1 *M. & Rob.* 112; Cowie *v.* Goodwin, 9 *C. & P.* 378.

If the objection to this evidence means that the tenant was bound to take notice that a party-wall might be built there, it is readily answered: he was not necessarily aware that the adjoining premises belong to a hostile owner, and there was no notice to him of the intention to do so, as there had been to his landlord. Good faith required that the lessor should have communicated this fact to his intended tenant; and if the lessee was bound to presume anything, it was that his lessor had conformed to the law as to party-walls, and built his wall and windows so that the occupants of the property should not be interfered with; and above all, that he had not so built them as to prevent his enjoyment of the premises demised.

*J. B. Townsend*, for the defendants in error.—It is denied that there was any offer in this case to prove eviction by title para-

[*Hazlett et al. v. Powell et al.*]

mount. The erection of the party-wall was under legislative authority, and against the wish and consent of the lessor. He had no power to control the use of the adjoining property: Dobbins *v.* Brown, 2 *Jones* 75; Baker *v.* Holtzapffel, 4 *Taunt.* 45; Arden *v.* Pullen, 11 *M. & W.* 321; Izon *v.* Gorten, 5 *Bingh. N. C.* 501; s. c. 7 *Scott* 537; Commonwealth *v.* Comly, 3 *Barr* 374; Magaw *v.* Lambert, *Id.* 444; Fisher *v.* Milliken, 8 *Barr* 121.

The opinion of the court was delivered by

THOMPSON, J.—The property which passed by the express terms of this lease was the lot of ground on which the "Columbia Hotel" was erected, to the extent of its boundaries, with dominion upwards and downwards, *ad infinitum*, "*cujus est solum, ejus usque ad cœlum, ad inferos*," together with the messuages, buildings, and fixtures on it, or appurtenant to it.

If the plaintiffs in error are entitled to an apportionment of the rent, it is because some covenant of the landlord has failed, in regard to some portion of the premises, by reason of which the lessees have been evicted from, or disturbed in, their possession, by title paramount; or because of fraud in the contract.

The covenant implied by the words "demise and lease," used in the indenture, is a covenant for quiet enjoyment and for title: 8 *Harris* 484; 13 *N. H. Rep.* 513; *Rawle on Cov.* 145; 7 *Mass. Rep.* 68; 8 *Mass.* 201; 11 *Johns.* 122; and undoubtedly covered all that passed by the terms of the lease.

The body of the grant, and the possession under it, remained intact and in the undisturbed occupancy of the lessees, up to and at the time of trial. The complaint regards eighteen windows obstructed and darkened by a party-wall erected by the adjoining owner. Was this an eviction or disturbance for which the lessor is answerable by reason of the covenants entered into with the lessees? This depends upon the contract, and the right of the lessor to the premises. It will not be denied, that if the lessor had conveyed or leased by express terms to the lessees, a right to the unobstructed enjoyment of light and air over the vacant lot, for and during their term, he would have been answerable for it, in case of eviction or disturbance. It would have been a clear breach of his covenant for quiet enjoyment. Although it is truly said that these elements are of "common right," yet, so far as they descend upon, or exist above, a man's ground, they are as much his property as is the ground itself, subject, of course, to the common use of all while on the premises. So a lateral approach of light and air may be an easement; *Gale and Whatley* 191; the right being subject to be acquired by grant or prescription, and of course to be lost in the same way.

The windows were darkened by the acts of the adjoining owner on his own property, by virtue of a title to that property, and not

[Hazlett *et al. v.* Powell *et al.*]

on account of any right or dominion over the lessor's property. Had the lessor conveyed, either expressly or by implication, anything, the title to which this assertion or exercise of ownership by the adjoiner was paramount? In the lease itself, although it was very special, and defined clearly what the parties had respectively undertaken to do, yet there was not one word in regard to these windows, or the enjoyment of light and air through them. There was no express undertaking on the subject, and no breach of the covenant on that account.

Did the right pass under the term "appurtenances" in the lease? If it had been offered to prove that a right to an easement of the kind existed in the lessor, and had been attached to his building, it would most certainly have so passed. In fact it would then have been part of the thing granted, and would have passed as an incident by any terms that would convey the principal. But there was not the slightest attempt to show that this was the case, or that such an easement ever existed by grant, prescription, occupancy, or in any other way. In no case is the ordinary enjoyment of light and air an appurtenance to property; it only becomes so by a right of way or approach derived by purchase—in England by prescription—in modern times by prior occupancy for twenty years. It is thought this doctrine is inapplicable to our country, and has never been adopted as the law of the land. It certainly seems not to be recognised in this Commonwealth. But nothing is predicated of it in this case, as it does not appear that the Columbia Hotel was erected one, or five, or ten years before the new erection. The word "appurtenances" in the lease, therefore, did not apply to light and air in their ordinary descent; and as the lessor had no special property, or a right of passage to his windows over his neighbour's property, it did not pass in that shape.

Had the vacant lot belonged to the lessor at the time of leasing, then an easement by implication, in the passage of light and air, would have followed: Maynard *v.* Esher, 5 *Harris* 226 ; Story *v.* Odin, 12 *Mass.* 157. There seems to be no doubt of this. But such an implication exists only in case of ownership. To extend it to a case where there was no ownership, would simply make the rule universal, and imply an easement for the passage of these elements whenever one happened to build adjoining vacant ground; a doctrine which neither reason nor policy could sanction. But the implication arising out of ownership only, is an argument of power against its extension to non-ownership. It undoubtedly does not so extend. The passage of light and air over adjoining lands, unlike that of water, affords *per se* no evidence of the enlargement of such by an easement: *Gale and Whatley* 191. So no presumption could have arisen in this case that the lessor had any right to an easement by being the prior builder on his lot.

[Hazlett *et al. v.* Powell *et al.*]

And the law itself forbids the lessees from regarding it as such—if they were deceived it was their own fault.

But the rejected proposition also contained an offer to prove that the lessor knew, at the time of executing the lease, that the adjoining owner intended building on his lot—at what time was not offered to be shown—and did not communicate this information to the lessees. We think he was not bound to do so; and that if the evidence had been received it would have furnished no evidence of fraud on part of the lessor, or become the foundation in equity for relief of the lessee. The substance of the complaint regarded something that the lessor was no more presumed to know than the lessees—it was nothing which concerned the title of the lessor or the title he was about to pass to the lessees. It was a collateral fact—something only within the knowledge and determination of a stranger to both parties, and, if material to either, I can see no obligation resting on either side to furnish to the other the information. It was not alleged that the lessor made any representations on the subject, or that there was any concealment of the information; or that any relation of trust and confidence existed between the parties; or that the lessees were misled by his silence, and entered into the contract under the belief that the vacant lot would not be occupied; or that they were in a position in which they could not by diligence have ascertained the fact for themselves, and that they were not legally bound to take notice of the probability that the ground would be occupied by buildings, and inquire for themselves. These were elements to be shown to constitute fraud, and make the testimony available.

"The general rule, both in law and equity," says *Story on Contracts* § 516, "in respect to concealment, is, that mere silence in regard to a material fact, which there is no legal obligation to disclose, will not avoid a contract, although it operates as an injury to the party from whom it is concealed." But the relation generally which raises the legal obligation to disclose facts known by one party to the other, is where there is some especial trust and confidence reposed, such as where the contracting party is at a distance from the object of negotiation, when he necessarily relies on full disclosure; or where, being present, the buyer puts the seller on good faith by agreeing to deal only on his representations. In all these, and kindred cases, there must be no false representations, nor purposed concealments: all must be truly stated and fully disclosed. "The vendor and vendee," says *Atkinson on Marketable Titles* 134, "in the absence of special circumstances, are to be considered as acting at arm's length." "When the means of information as to the facts and circumstances affecting the value of the subject of sale are equally accessible to both parties, and neither of them does anything to impose on the other, the disclosure of any superior knowledge which one party may

[Hazlett *et al. v.* Powell *et al.*]

have over the other, is not requisite to the validity of the contract:" *Id.* Illustrative of this is the celebrated case of Laidlaw *v.* Organ, 2 *Wheaton* 178. The parties had been negotiating for the purchase of a quantity of tobacco; the buyer got private information of the conclusion of peace with Great Britain, and called, very early in the morning following the receipt of it, on the holders of the tobacco, and, ascertaining that they had received no intelligence of the peace, purchased it at a great profit. The contract was contested for fraud and concealment. Chief Justice MARSHALL delivered the opinion of the court, to the effect that the buyer was not bound to communicate intelligence of extrinsic circumstances which might influence the price, though it were exclusively in his possession. And Chief Justice GIBSON, in Kintzing *v.* McElrath, 5 *Barr* 467, in commenting on this decision, says: "It would be difficult to circumscribe the contrary doctrine within proper limits, where the means of intelligence are equally accessible to both parties." See also Hershey *v.* Keembortz, 6 *Barr* 129. When the information is derived from strangers to the parties negotiating, and not affecting the quality or title of the thing negotiated for, it is not such as the opposite party can call for. We see no error in the rejection of the evidence on account of this part of the proposition, as there was no moral or legal obligation for the lessor to disclose any information he had on the subject of the intended improvement of the adjoining lot. It was not in the line of his title. It was derived from a stranger; it might be true or false; and the lessees could have got it by inquiry as well as the lessor.

It is well settled, that there is no implied warranty that the premises are fit for the purposes for which they are rented : 12 *Mees. & W.* 52 and 68; 7 *Hill* 83; Carson *v.* Godley, 2 *Casey* 117; *Arch. on Landlord and Tenant* 53. Nor that they shall continue so, if there be no default on part of the landlord. In Taverner's Case, 1 *Dyer* 58, the tenant had a lease of land with a flock of sheep. The sheep died, and the tenant claimed an apportionment of rent, although there was no default on part of the landlord. The case was much discussed, but not finally decided. Afterwards, in the time of Car. II., the case of Paradise *v.* Jayne, *Aleyn's Rep.* 26, the principle contended for in Taverner's Case was fully overruled. So too it is settled, if anything may be considered settled, that a covenant to pay rent is not extinguished by the destruction of the leased premises by fire, unless there be an express agreement to that effect. For this see *Story on Contracts* § 908; 10 *Mees. & W.* 321; 3 *Kent's Com.* 575; Baker *v.* Holtzapffel, 4 *Taunt.* 45; Arden *v.* Pullen, 10 *Mees. & W.*; Same Case, 7 *Scott's Com. B. & Excheq. Rep.* 537; Carson *v.* Godley, 2 *Casey* 117; Magaw *v.* Lambert, 3 *Barr* 444; Fisher *v.* Milliken, 8 *Barr* 121. From this investigation, it results that

[Hazlett *et al. v.* Powell *et al.*]

we discover nothing in the rejected offer, which, if it had been received, would have shown a breach of the lessor's implied covenant for quiet enjoyment in the building by the adjoining owner of the party-wall. Nor any fraud in the silence of the lessor in not disclosing his information in regard to the intention of the adjoiner to build. Nor any grounds for an apportionment of the rent accruing, on account of obstructions occurring without any default of the lessor being shown.

Judgment affirmed.