## Cusick v. Woolworth.

*Landlord and tenant—Uninhabitable condition of premises—Mine caves—Refusal to pay rent—Entry of judgment for rent for full term.*

A leased certain premises to B for eight years at a stipulated rent for the term. There was no covenant to repair. By reason of surface subsidences, due to mine caves, caused by a third party, the premises became uninhabitable. The tenant moved from the premises before the end of his term and refused to pay rent for the remainder of the term. The landlord entered judgment for the rent for the full term under a warrant to confess judgment contained in the lease: *Held*, refusing to open the judgment, that the uninhabitable condition of the premises did not relieve the tenant of his obligation to pay rent.

Rule to open judgment. C. P. Lackawanna Co., Jan. T., 1918, No. 478.

*Knapp, O'Malley, Hill & Harris*, for plaintiff.

*O'Brien & Kelly*, for defendant.

MAXEY, J., Dec. 12, 1923.—This proceeding is a rule to open a judgment admittedly regular and entered in accordance with the terms of a written lease, under seal, in which the plaintiff leased to the defendant certain property in Scranton for a term of eight years at a certain rental for the term, payable in monthly instalments.

### Facts of the case.

The lease in question was dated April 1, 1911. Its term was eight years. It provides for a rental of $1500 per annum, payable $125 per month. The

subject of the lease is described as follows: "Being all that store and basement known and designated as No. 138 and No. 140 North Main Avenue, City of Scranton, aforesaid, a plan of which, according to the plans prepared by Kreig & Osterhout, Architects, is hereto attached and made a part hereof." The building in question was a frame building. It consisted of two stores on the ground floor, with basement attached, and two dwelling-apartments on the upper floor. The plaintiff rented one of these stores with a basement thereunder to the defendant; rented the other store with the basement under it to another tenant; and rented the upper floor to other tenants for dwelling purposes. The portion of the building occupied by the defendant was used by him for a five-and-ten-cent store.

The lease contained no covenant to repair.

On Feb. 1, 1917, the defendant vacated the premises, paid his rent to that date, and refused to pay any rent thereafter. On Dec. 3, 1917, judgment by confession was entered against the defendant for $12,000, said sum being the rent for the entire term of eight years. Defendant obtained a rule to show cause why judgment should not be opened. The amount really in controversy between the parties is the rent for a period beginning Feb. 1, 1917, the time when the defendant vacated the premises, and the expiration of the term of the lease, March 31, 1919, that is, two years and two months, at a rental of $125 a month, or a total of $3250.

The contention of the defendant is that the demised premises were destroyed by a mine subsidence, and that by reason thereof, he was deprived of the use and occupation of the demised premises and relieved of any further payment of rent. The allegation is that the Peoples Coal Company so conducted its mining operations underneath the premises as to cause a general subsidence of the surface, thereby causing cracks to appear in the walls of the building, and that finally the premises became so dangerous, in the opinion of the building inspector of the City of Scranton, that on Dec. 30, 1916, he served the following notice on the defendant:

"In view of the badly damaged condition of the store building now occupied by you at the above location, I deem it unsafe for further use as a place of business where large numbers of people are placed in danger of injury. Therefore, in the interests of public safety, you are hereby notified to close the same for public use, and are advised to remove from the same."

It was testified to in the depositions that a mine cave occurred in the year 1915, which dropped the surface under the north line of the property three feet, and under the south line of the property one foot, and that thereafter the surface continued to subside gradually for a period of five years, within which time it had subsided five feet, and that the subsidence caused a huge crack in the basement of defendant's store.

J. A. Flaherty, manager for the Woolworth Company, testified that when the company vacated "the store was in a very dilapidated condition. . . . The crack in the cellar was still opening a little space. The building tilted toward Price Street, because the ends were in the frame building next to it and wouldn't fall, the building wouldn't fall. There was a very bad crack on the northerly side wall; in the rear there was a crack, and on the southerly side of it a wide open crack."

E. L. Walter, the city official who ordered the defendant not to admit the public to his store, testified that he told the manager of the store that "the building was in a dangerous condition; something must be done to repair it; the wall was liable to fall." This was about one year before he gave the

4 D. & C.

defendant notice to vacate.  He also testified that conditions "kept getting worse all the while; . . . the floor kept going down further.  At first I told them there was no absolute danger as long as the floors were kept up, there was no immediate danger; but that piece of wall must be repaired or taken down, that that might fall and injure someone.  But it kept getting worse, and I was very anxious about it, because I didn't know but that it might get to be a dangerous situation. . . . I told them I thought it was getting to be too dangerous for them to remain in there. . . . I told them it was getting worse, and that it would be necessary for them to move out in the interest of public safety.  They said they would like to stay until after Christmas.  I looked it over and said I thought we could take a chance up to that time; and after that it was moving gradually, and I sent them this notice."

Engineer Monroe (called by the defendant), testified that he didn't think the building "could be repaired with any degree of certainty of safety.  It was situated on the edge of the cave, where it was continually dragging and moving.  Certainly it could have been repaired and would stand for a short while, nobody knows how long.  You would have to be repairing it all the time."  He was asked: "If repairs had been made of the Cusick Building it would have stood, would it not?"  He answered: "It would have stood just simply to the extent of the repairs, until the continual dragging made it necessary for more repairs."  Q. "It is much easier to repair a frame building, is it not, than a brick building?  A. I should think it would be."  He also testified that this gradual caving in "would disturb the surface and the foundation walls that existed there, make them less stable, less strong."  He further testified: "I don't think it would be a safe proposition to put a building up there.  The building wouldn't stand.  The foundation wouldn't stand permanently."

### Question involved.

There is no doubt that the city building inspector was justified in pronouncing the store building "unsafe as a place of business where large numbers of people are placed in danger," and in notifying the defendant "to close the same for public use," and in advising the defendant "to remove from the same."  As a place of business the premises had become unsafe; commercially they had become comparatively valueless, and for most purposes untenantable.  Therefore, the question before us is this: Did this condition of the premises relieve the defendant of his obligation to pay the rent for the entire stipulated term?

### The law of the case.

24 Cyc., 1154: "Where there is no fraud, false representations or deceit, and in the absence of an express warranty or covenant to repair, there is no implied covenant that the premises are fit for occupation or for the particular use which the tenant intends to make of them, or that they are in a safe condition for use; and if the premises become untenantable, the tenant is not thereby released from his covenant to pay rent, unless he protects himself by some clause in the lease."

24 Cyc., 1156: "At common law, the holder of premises which were actually destroyed subsequent to the making of the lease cannot be relieved against an express covenant to pay rent unless he has stipulated in the lease for a cessation of the rent in such case or the lessor has covenanted to rebuild; nor will equity relieve against express covenants, except in the case of fraud, accident or mistake."

24 Cyc., 1158: "As no warranty results by implication of law that the land leased shall remain in the same condition, the lessee cannot refuse payment of rent on the ground that after the execution of the lease the premises were destroyed or their use rendered inconvenient by an act done in the lawful exercise of the authority of a public corporation."

Reeves v. McComeskey, 168 Pa. 571, McCollum, J., page 574: "Assuming they (the demised premises) were not tenantable when he (the tenant) abandoned them, and that he left them because they were not, do these facts constitute a defence to the claim for rent for the balance of the year? The lessor did not warrant or represent them to be tenantable, or undertake, if they were, to keep them so, and there is no implied covenant of this nature founded upon or arising from the relation of landlord and tenant. In the absence of a provision in the lease that the lessor shall repair, it is no defence to an action for the rent that the demised premises were not in a tenantable condition: Wheeler et al. v. Crawford, 86 Pa. 327, and Moore v. Weber, 71 Pa. 429; see, also, Jackson & Gross on Landlord and Tenant, §§ 288-963 and 1045."

Paxson & Comfort Co. v. Potter, 30 Pa. Superior Ct. 615, Henderson, J., page 616: "There is no doubt that where there is a covenant to pay rent in a lease of land with a building erected thereon, the destruction of the building by fire does not absolve the lessee from liability for the rent. This rule has its foundation in the fact that the tenant is still in possession of the soil on which the building was located, and that something remains to which the lease attaches. He may use the land for some purposes and may reconstruct the building. But the rule is not applicable in the case of the demise of an apartment in a building. In such a lease the tenant does not acquire a right to the possession of the land. It is impossible that the occupants of different stories of the same building could each retain possession of the soil under his apartment in the event of the destruction of the building. In such a tenancy there is no understanding, either by landlord or tenant, that an estate in the land upon which the building is erected is granted. By the destruction of the building the whole estate demised is extinguished. The thing demised is not a space in air, but a portion of the building. When the building is destroyed, nothing remains which the tenant can enjoy or claim."

Hollis v. Brown, 159 Pa. 539: In this case it was held that an affidavit of defence on an action for rent of a dwelling-house was insufficient which averred that "in the winter defendants discovered that the premises were in a wholly unfit and unhabitable condition, owing to the defective construction of the drainage; and being informed by their physician that it was dangerous to their lives to remain, they removed from the said premises as soon as the critical condition of the health of one of the defendants permitted her to be removed, and had they not vacated the premises, the board of health would have required them to do so."

Huber v. Baum, 152 Pa. 626, Paxson, C. J., page 629: "Defendants allege in their affidavit of defence that they had leased the premises for the purpose of a morocco manufactory, and that the said building 'was totally unfit for the purpose for which the lessees rented the same, and to which use and purpose the lease restricted them; that it became untenantable and dangerous.' . . . .

"The defendants . . . had full opportunity to examine the property before they leased it and judge for themselves as to its fitness for their business. It ought by this time to be understood that a landlord is not bound to make repairs to demised premises unless he covenants to do so. . . .

4 D. & C.

Cusick v. Woolworth.

"The defendants had no right to call upon the plaintiffs to repair the building. It was their own folly, if the fact be so, to lease a building that was in such a dilapidated condition as not to answer their purpose during the extent of the term."

Hazlett v. Powell, 30 Pa. 293: "In a demise of land there is no implied warranty that the premises are fit for the purposes for which they are rented, nor that they shall continue so, if there be no default on the part of the landlord."

Humiston, Keeling & Co. v. Wheeler (Illinois), 51 N. E. Repr. 893: "A five-story building was leased with the exception of the fourth floor, office room on the second floor, and a space in the rear of the basement, which were retained by the lessor. Afterwards the interior of the building was burned out, but the walls were intact, and part of the lower floors remained. The first floor and the basement were not burned, but the former was covered with debris so as to be untenantable. Held, that, conceding the lease was only of 'portions of the building,' there was not an entire destruction of the building, within the rule that the destruction of the entire subject-matter extinguishes the agreement to pay rent."

The premises must be not merely damaged but annihilated: Lockwood v. Lockwood, 22 Conn. 425; Smith v. McLean, 14 N. E. Repr. 50.

Coy v. Downie, 14 Fla. 544: "Where there is an express covenant in the lease to pay rent, the loss by the lessee of the use of the premises by means of casualties of war will not excuse the payment of the rent, unless such casualties be expressly provided against in the lease."

Warren v. Wagner, 75 Ala. 188: "A lessee of premises destroyed during the term of the lease by unavoidable accident is not relieved from the payment of rent unless he protects himself by a stipulation in the lease, or unless there is a destruction of the entire subject-matter of the lease so that nothing remains capable of being held or enjoyed."

### Discussion.

From the foregoing authorities it appears to us that the rule is that when a tenant leases land on which there is a building, and the building is destroyed by fire without the fault of either party, in the absence of a covenant in the lease compelling the landlord to rebuild, such destruction of the building does not terminate the lease or relieve the tenant of his obligation to pay rent for the remainder of the term; but where the subject of the demise is an apartment in a building, and the building is destroyed by fire, the rule is otherwise. In one case the land is the thing demised and the building is but appurtenant to it, but where the demise is of a mere apartment, and the building containing the apartment is destroyed, the subject of the demise is extinguished. The thing out of which the rent issues must cease to exist before the liability to pay the rent is extinguished. An analogy may be found in an agreement pay for water from a spring. The water might become unusable, the health authorities might condemn it, but as long as water ran from the spring it would have to be paid for though it no longer had any economic value. In the case at bar the thing out of which the rent issued was destroyed economically but not physically. The tenant was no worse off than if he had rented the building for use as a fertilizer factory and the municipal authorities had later prohibited its use for that purpose, no worse off than if he had rented a building which, on account of some war breaking out, had become untenantable by reason of its being in or near the zone of war operations, or

because it was discovered that the building was in an earthquake zone and so constructed that it was unsafe to occupy it because of earth tremors.

The subject of the Cusick-Woolworth lease was fully existing when Woolworth vacated the premises. The storeroom and basement were in being. The land on which they rested was still land—unstable, it is true, but still existing. The stabilizing of that land by skillful mining engineering was not impossible, though, doubtless, from a pecuniary point of view it was impracticable. "The building could have been repaired," says Engineer Monroe (a witness for the defence), "and would stand for a short while, nobody knows how long; you would have to be repairing it all the time."

It seems a hardship on the defendant to hold that he must continue to pay rent after the premises ceased to have any rental value for him, but this is a situation from which he could have relieved himself by contract when he rented the premises. It was well known that the premises were within the mine-cave zone, and that they might become uninhabitable at any time by reason of mine caves. He took the building "for better or for worse," and the fact that it turned out to be "for worse" does not entitle him to relief from the bonds of tenancy. It was a risk the tenant assumed when he signed the lease, though by a covenant in the lease he could easily have protected himself against that risk. The Peoples Coal Company, not the plaintiff, caused the condition of which he now complains. As between landlord and tenant, the equities are equal, and when the equities are equal, the law must prevail.

In those cases where there is a complete destruction, that is, annihilation, of the subject-matter of the lease, the lease terminates, regardless of the wish of either party. The tenant who leases land and its appurtenances can remain on the land after the appurtenances are destroyed, and the landlord is powerless to evict him as long as he pays his rent. The tenant of an apartment of a building destroyed by fire cannot remain on the land even if he wishes to. He didn't lease an interest in the land. The thing, a part of which he leased, was totally destroyed, and there is nothing to which he can anchor or attach himself. In the case at bar the plaintiff could not have evicted the tenant from the premises as long as he paid the rent. If Woolworth had wished to keep his commercial flag flying on the store in question, if he had wished to use the premises merely for displaying advertisements, Cusick could not have ordered him off. This rule must work both ways. If the contract did not terminate for Cusick, it did not terminate for Woolworth. Its existence did not depend merely on the defendant's desire to vacate the premises, because under the circumstances his further occupancy of them was unprofitable or unsafe. Doubtless, if he had contemplated what was going to happen to the premises he would have insisted on a covenant in the lease which would have permitted him to remove from the premises when arose the contingency which he now claims per se terminated the lease, but he did not do that. This contingency did not as a matter of law end the lease for either party. The building itself was not physically destroyed; it could have been used by the defendant for some purposes, such as exhibiting advertisements, without risk to human life; and, in fact, if the city building inspector had not notified the defendant "to close the store building for public use," it is quite probable that he would have continued to do business there for some time longer, as he did remain on the premises for a year even after the building inspector pronounced the building "in a dangerous condition." Not only was the building itself not physically destroyed, but the tenant, in leasing the basement, inferentially leased certain rights in the surface of the land itself on which the basement rested. His lease involved very substantial

4 D. & C.

Cusick *v.* Woolworth.

rights in the surface of the soil, a thing which the tenant of a mere apartment above the ground floor has not; but it is not necessary to base our conclusion in this case upon that fact, for the very premises themselves which the defendant leased were not so destroyed as to come within the rule of law that when the subject-matter of a contract is totally destroyed the contract ends.

### Conclusion.

The defendant on April 1, 1911, bought from the plaintiff eight years' possession of certain premises for a certain price. The plaintiff gave no guaranty as to the future condition of said premises, he perpetrated no fraud, made no false representations, practiced no deceit. There was no express warranty, and none by implication of law that the land and premises were in a safe condition and fit for occupancy, or if they were, that they would remain so. The defendant assumed the same risk he would have assumed if he had purchased the premises or had leased them for ninety-nine years or nine hundred and ninety-nine years.

Through the trespass of a third party, the Peoples Coal Company, the possession of said premises became a property right of little or no value. What would otherwise have been a valuable asset was lost to Woolworth from Feb. 1, 1917, to March 31, 1919, a period of twenty-six months, and was lost to Cusick from April 1, 1919, onwards. The value of the respective property rights of each in the premises was greatly impaired by a third party's wrongful acts. Both plaintiff and defendant have rights of action against the trespasser. That the trespasser is "execution proof" does not affect the respective rights and obligations of plaintiff and defendant as to each other. In the balancing of equities between plaintiff and defendant there is no inclining of the scales. The equities are equal and the covenants of the lease must prevail. The eight years' possession of the premises that the plaintiff sold and defendant bought must be paid for as is "nominated in the bond."

### Order.

Now, to wit, Dec. 12, 1923, the rule to show cause why the judgment in the above-entitled case should not be opened is discharged.

From John G. McAskie, Scranton, Pa.